UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN MUNICIPAL RISK
MANAGEMENT AUTHORITY,                          Case No. 07-15136

       Plaintiff,                                   Honorable Nancy G. Edmunds

v.

STATE FARM FIRE AND CASUALTY
COMPANY,

       Defendant.
_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [19] AND GRANTING IN PART PLAINTIFF'S CROSS-MOTION FOR
SUMMARY JUDGMENT [32]**

This insurance dispute arises out of the termination of Michelle Horton, an employee

of the 48th District Court located in Bloomfield Hills, Michigan.  As a result of her

termination, Ms. Horton filed two lawsuits; one in federal court against her employer (which

resulted in a jury verdict of approximately $3 million in her favor) and another in state court

against Sharon Law, the elected Township Clerk for the Township of West Bloomfield,

Michigan (which was subsequently settled for $200,000).  The state court action against

Sharon Law alleged that Ms. Law spread false rumors about Ms. Horton to Ms. Horton's

employer thus triggering an investigation that led to her unlawful termination and asserted

a claim of intentional interference with Ms. Horton's advantageous business relationship

and expectancy with her employer, the 48th District Court.

This lawsuit concerns only the state court action against Ms. Law.  More specifically,

it concerns a dispute between Ms. Law's employer's insurer, Michigan Municipal Risk

Management Authority ("Michigan Municipal"), and her homeowner's insurer, State Farm Fire and Casualty Company ("State Farm"), about State Farm's duty to defend and indemnify Ms. Law in the state court action against her. Initially, both Michigan Municipal and State Farm undertook Ms. Law's defense in the state court action. State Farm did so under a reservation of rights. State Farm subsequently denied Ms. Law's claim for a defense and indemnification under her homeowner's and umbrella policies. It did so after the Oakland County Circuit Court denied her motion for summary disposition, finding material questions of fact existed for trial. Michigan Municipal continued its defense of Ms. Law and, shortly thereafter, settled Ms. Horton's lawsuit against Ms. Law for $200,000. Michigan Municipal demanded and State Farm refused to participate in or to contribute to payment of the agreed-upon settlement. Michigan Municipal then filed this lawsuit against State Farm (Ms. Law having assigned all her rights to Michigan Municipal) alleging that State Farm (1) breached its homeowner's and umbrella insurance contract with Ms. Law; (2) breached the implied covenant of good faith and fair dealing in those insurance contracts; and (3) breached its duty to act in good faith in settling the claims in the state court action.

This matter is now before the Court on the parties' cross-motions for summary judgment. Defendant State Farm argues that it is entitled to summary judgment because (1) under the terms of Ms. Law's homeowner's and umbrella insurance contracts, it had no duty to defend or indemnify for the claims asserted against her in the underlying state court action; and (2) under Michigan law, there is no cause of action for the alleged breach of an implied covenant of good faith and fair dealing and no cause of action for the failure to act in good faith in settling claims arguably covered by its insurance policies. Plaintiff Michigan

Municipal's cross motion argues the opposite: that (1) State Farm breached its duty to defend under Ms. Law's policies; and (2) breached the implied covenant of fair dealing and good faith when it retained counsel that was not independent, prematurely withdrew its defense, and failed to participate in the settlement of the state court action – contract claims that are well-established under Michigan law.

For the reasons stated below, Defendant State Farm's motion for summary judgment is DENIED. Plaintiff Michigan Municipal's cross motion is GRANTED as to Defendant State Farm's liability for the breach of its contractual duty to defend and the breach of its policy's implied covenant of good faith and fair dealing for the premature withdrawal of its defense and its refusal to participate in settlement negotiations. Plaintiff's motion is DENIED without prejudice as to the amount of damages owed by Defendant as a result of its breach.

## I. Facts

### A. Underlying State Court Action

After her termination from the 48th District Court, Michelle Horton filed a lawsuit against Sharon Law in Oakland County Circuit Court ("state court action") asserting a claim for tortious interference with an advantageous business relationship or expectancy. Ms. Horton alleged that Ms. Law spread false and negative rumors about her to 48th District Court officials, causing *inter alia* damage to her good name and reputation in the community and leading to her termination. (Def.'s Ex. A, Horton Am. Compl.) Specifically, she alleged the following.

Ms. Horton worked at the 48th District Court for 14 years.[1] In 2004, she was designated "Employee of the Year." Nonetheless, she was terminated on December 16, 2004. At the time of her termination, Marc Barron had recently won a contested judicial seat on the 48th District Court but had not yet assumed the position. (Horton Am. Compl. ¶¶ 7-10.)

In July 2004, during Marc Barron's judicial election campaign, his wife, Lori Barron, was arrested for operating a vehicle while intoxicated. Her arrest record was entered at the 48th District Court via a document called a "Register of Actions" or "ROA." (*Id.* at ¶ 12.) At some point, two hand-written notes were attached to that ROA. One note stated: "Kim: <u>Interesting</u> - This should be her <u>2nd</u> offense. This is 'Mark Barron' [sic] wife. Running for District Court." (*Id.* at ¶ 13.) The other note stated: "No Media coverage. What's to hide?" (*Id.*) Upon becoming aware of the notes, Marc Barron became angry and sought to find out who wrote them. He was particularly concerned about the political consequences of the "second offense" notation. (*Id.* at ¶¶ 15-16.)

During this time, Sharon Law held the elected position of Clerk for the Township of West Bloomfield. Her son had worked with Marc Barron in the Oakland County Prosecutor's Office, and Ms. Law supported Barron in his campaign for the 48th District Court judicial seat. (*Id.* at ¶¶ 16-17.) A Township employee who reported to Ms. Law gave her a copy of Mrs. Barron's ROA with the handwritten notes. According to testimony given by 48th District Court Judge Diane D'Agostini in the federal court action, Ms. Law told her

---

[1]The 48th District Court handles matters with an amount in controversy that does not exceed $25,0000, exclusive of interest, costs, and attorney fees for Birmingham, Bloomfield Hills, Sylvan Lake, Keego Harbor, Orchard Lake Village, and the Townships of Bloomfield and West Bloomfield.

about the ROA and handwritten notes while they were both attending a political fundraiser. Ms. Law identified Ms. Horton as the person who wrote the notes and/or had circulated a copy around the Township. Ms. Horton denied that she did either. She also denied that she contacted the media about Mrs. Barron's arrest. (*Id.* at ¶¶ 17-22.)

Ms. Horton alleged that she became the target of an investigation launched by her employer, the 48th District Court, and the target of a criminal investigation based on (1) false and negative rumors about her passed along by Ms. Law, and (2) a desire to harm the person Ms. Law believed was responsible for disseminating information that could damage Marc Barron's judicial campaign. (*Id.* at 23-25.)

Shortly after Marc Barron won the election for the judicial seat on the 48th District Court, Ms. Horton (who served as the vacating judge's clerk) was moved to the Probation Department. On December 16, 2004, Ms. Horton was notified that her employment at the 48th District Court was being terminated because of her "personal use" of the Court's "SOS" and "LIEN" systems. Ms. Horton denies that she ever did so. (*Id.* at ¶¶ 26, 32-33.) In her state court action, Ms. Horton alleged that her termination was a direct result of Ms. Law's wrongful, vindictive, and politically-motivated interference and efforts to get her fired. (*Id.* at ¶¶ 11, 35.) She further alleged that Ms. Law actively sought to undermine her employment by making groundless attacks against her and demanding that her employment be terminated. It is also alleged that Ms. Law acted with malice in interfering with her business relationship and expectancy with the 48th District Court. (*Id.* at ¶¶ 39-41.) Ms. Horton alleged that, as a result of Ms. Law's wrongdoing, she lost (among other things) her job and career opportunities, suffered damage to her good name and reputation

in the community, suffered mental and emotional distress, humiliation and embarrassment, and sustained money damages.  (*Id.* at ¶ 48.)

### B. Ms. Law Tenders a Claim to Plaintiff and Defendant

Ms. Horton filed her state court action against Ms. Law on November 13, 2006. Plaintiff Michigan Municipal defended Ms. Law in the state court action because there was a question whether she was acting within the scope of her official duties or operations at the time of the alleged wrongdoing.  (Pl.'s Mot. at 1.)  Plaintiff Michigan Municipal is a self-insurance pool created by intergovernmental contract pursuant to Mich. Comp. Laws § 124.5.  Ms. Law is the elected Township Clerk for the Township of West Bloomfield, Michigan.  As a member of Michigan Municipal the Township of West Bloomfield is entitled to insurance coverage under the intergovernmental Coverage Document as are its employees when acting within the scope of their official duties or operations.  (Pl.'s Mot. at 1, n.1.)  Michigan Municipal retained the law firm of Johnson, Rosati, LaBarge, Aseltyne and Field, P.C. ("retained counsel") to defend Ms. Law in the state court action.

Ms. Law also sought and initially obtained a defense from Defendant State Farm under her homeowner's and umbrella insurance policies.  State Farm defended her under a reservation of rights while it investigated whether it owed her a duty to defend under either of her policies.[2]   State Farm retained the law firm of Romain, Kuck & Egerer, P.C. ("State Farm's retained counsel") to represent Ms. Law in the state court action.

---

[2]In a February 14, 2007 letter, State Farm expressly reserved the right to deny Ms. Law a defense or indemnification under its policies because there were questions whether the damages claimed (1) were caused by an occurrence as defined in the policy; (2) meet the definition of bodily injury or property damage as defined in the policy; (3) are the result of willful and malicious acts of the insured; and (4) are the result of bodily injury or property damage arising out of the business pursuits of any insured.  (Def.'s Ex. D, 2/14/07 letter.)

On February 6, 2007, a State Farm claims representative spoke with Michigan Municipal's retained counsel and was told that "the defense for Ms. Law is good, as [Ms.Horton] will be hard pressed to show that [Ms. Law] committed any affirmative act to intentionally injure or damage [Ms. Horton]."  (Pl.'s Ex. E, State Farm Activity Log, 2/6/07 1:00 p.m. entry.)

On February 21, 2007, there was a conference among the State Farm claims representative handling Ms. Law's claim, a team manager, and State Farm's retained counsel.  The activity log notes reveal that deposition and trial transcripts from Ms. Horton's federal court lawsuit against the 48th District Court were reviewed.  It was noted that the jury in the federal court action "ultimately concluded that [Ms. Horton's] termination was politically motivated, and they awarded $3+ million in damages, including punitive damages.  The award was reduced through a compromised settlement, and the end figure is subject to a confidentiality agreement but is probably between $1.3 million and $2 million."  (Pl.'s Ex. F, State Farm Activity Log, 2/21/07 11:25 a.m. entry.)

## C. State Farm Determines It Owes No Duty to Defend or Indemnify

On March 9, 2007, a State Farm claims representative called Ms. Law, telling her that Ms. Horton's complaint only alleges conduct on her part while she was acting in the scope of her employment and thus coverage is expressly excluded under the terms of her umbrella policy.  State Farm then informed Ms. Law that it would continue to pay for retained counsel for her defense in the state action through the hearing on a pending motion for summary disposition filed on her behalf.  (State Farm Mot. at 3; Pl.'s Ex. K, 3/9/07 Activity Log, 2:41 p.m. entry.)  That same day, State Farm sent Ms. Law a letter confirming that, as of May 9, 2007, it was withdrawing its defense on Ms. Law's behalf in

the state action and would discontinue payment of all attorney fees or defense costs as of that date. (Pl.'s Ex. L, 3/9/07.) It provided numerous reasons for doing so. State Farm concedes that its denial letter to Ms. Law erroneously cited exclusions in the umbrella policy that were modified by Endorsement FE-7786. (Def.'s Mot. at 10.)

In the meantime, litigation in the state action continued.

At Ms. Horton's April 26, 2007 deposition in the state action, she was asked to clarify her allegations against Ms. Law:

> Q: Is it your opinion in your mind that Sharon Law, as part of this group that you've talked about, did this, passed down this information because Sharon Law wanted to see Michelle Horton get fired from the 48th District Court? Is that your opinion?
>
> A: My opinion is that her allegations led to my firing.
>
> Q: What do you think motivated her?
>
> A: Her friendship with Marc Barron.
>
> Q: And do you think her motivation was to see you fired?
>
> A: I believe the allegations led –
>
> * * * *
>
> Q: Do you have an opinion as to whether or not she wanted to see you fired? Simple as that.
>
> A: I believe this was malice, so I believe that you don't – you do not say things about someone that you don't know and don't expect to have consequences from them.
>
> * * * *
>
> A. I believe her allegations were done in malice, and I don't think that they were done to give me a promotion. They were – they were done in malice to see harm done to me. . . .
>
> Q: Why do you say they were done in malice?

A: Because I don't know her. She had no personal knowledge of me, and these things all happened three to four years prior.

Q: Any other reason you say she did that with this pass of information on with malice; any other basis for that?

A: Because she was friends with Marc Barron. . . . And this would help her . . . to look good in his eyes.

Q: Okay. Are you alleging that Harkins wanted to see you fired for some ulterior purpose?

A: It was stated in his notes that he wanted to build a case against me because of the Barron leak.

Q: That was the notes on his conversation with Kim Small where she told him to build a case; is that what you're talking about?

* * * *

A: Yes.

* * * *

Q: Do you know what information caused him to decide he needed to build a case?

A: Based on your client's telling him that I was the one who started the Barron leak with media regarding his wife.

(Horton 4/26/07 Dep. at 27-31.)

On April 30, 2007, Ms. Law was deposed in the state court action. She testified that she told 48th District Court Judge D'Agostini at a political fund-raising event that she had heard that "somebody" at the Court "was possibly influencing the way tickets came out" and was also "distributing false information" or talking about a second drunk driving offense for Lori Barron. (Law 4/30/06 Dep. at 42, 54.) A few days later, Ms. Law received a phone call from Jim Harkins, Court Administrator for the 48th District Court, who asked her if she could obtain more information about Ms. Horton. Ms. Law replied that she would try to do so.

9

(*Id.* at 54-55.)  Ms. Law did obtain more information from a former 48th District Court employee, Kimberly Bykaylo, and relayed that information to Mr. Harkin.  (*Id.* at 57, 59, 68.) She did so despite her lack of personal knowledge as to the information she provided.  (*Id.* at 68; Fed. Action Trial Tr. 11/27/06 at 18.)  Ms. Law testified why she did so.  "I had no reason to get [Ms. Horton] in trouble or to say anything maliciously against her, since I did not know her.  My concern was regarding the Court."  (Law 4/30/06 Dep. at 57.)

Michigan Municipal's retained counsel filed a motion on Ms. Law's behalf arguing, in part, that she was entitled to summary disposition because her challenged conduct was performed in the course and scope of her employment, thus entitling her to immunity from suit.  Ms. Horton disputed these arguments with supporting evidence and legal authority. She argued in response that "overwhelming evidence shows that [Ms. Law] performed acts alleged in the service of a favored political figure and not in the course and scope of her employment."  (Pl.'s Ex. M, Horton State Action Resp. at 2.)  Ms. Horton argued that none of Ms. Law's duties as a township clerk had any connection to her alleged conduct in the Horton lawsuit.  (*Id.* at 9-18.)  She also presented evidence that the West Bloomfield Supervisor, at a Township Board meeting, stated that Ms. Law's acts were "political" and "personal" and it was clear that "Sharon Law meddled in the affairs of the Court without good reason, and so recklessly that she does not deserve the support of the taxpayers to defend this [state court action against Law].  Without any specific knowledge, [Sharon Law] passed along several rumors about Michelle Horton.  Every one turned out to be false or without proof."  (*Id.* at 14.)

Rather that acting within the scope of her duties as West Bloomfield's Township Clerk, Ms. Horton argued, Sharon Law "fed false information" to Ms. Horton's employer, the

48th District Court, "in order to assist the political career of a family friend, Marc Barron." (*Id.* at 10, 12, 17, 18, 20.)  Ms. Horton further argued that Ms. Law's statements about her were made with "actual malice" -- made with knowledge that they were false or with reckless disregard of whether they were false or not – and thus did not afford Ms. Law qualified immunity for her false statements.  (*Id.* at 18-19.)

On May 23, 2007, Oakland County Circuit Court Judge O'Brien heard oral argument on Ms. Law's motion for summary disposition in the state action.  (Pl.'s Ex. N, 5/23/07 Tr.)  Ms. Law's motion was denied.  (*Id.* at 20.)  The Court determined that material questions of fact remained for trial on the issues whether:  (1) Ms. Law was acting within the scope of her governmental authority when she engaged in the challenged conduct (*id.* at 20-23), and (2) Ms. Law's statements were made with reckless disregard as to their truth or falsity (*id.* at 22).

Specifically, as to (1) above, the Court observed that "[Ms. Law] is being sued for acting outside the scope of her position as an agent of the township.  She cannot rest on her official position to avoid litigation over the issue of whether or not she acted beyond her official position.  The Court again finds that there is evidence other than [Ms. Horton]'s own subjective beliefs corroborating [Ms. Law's] alleged improper political motive. . . . [T]he 48th District Court and [Ms. Law] as township clerk for the Township of West Bloomfield are separate and distinct entities. . . . are two separate branches of government, judicial and executive."  (*Id.* at 23.)

As to (2) above, the Court observed that "[t]here is ample evidence in this case, at least at this juncture to suggest that statements made by [Ms. Law] to the judge and the

court administrator were made with reckless disregard of whether they were false or not, just to suggest, I'm not saying that they were, but it creates a question of fact." (*Id.* at 22.)

### D. State Farm Formally Withdraws Its Defense of Ms. Law

On May 24, 2007, without consulting its insured, State Farm's retained counsel wrote to Michigan Municipal's retained counsel and Ms. Horton's counsel requesting a stipulation allowing him to withdraw as co-counsel for Ms. Law because State Farm was denying coverage under its homeowner's and umbrella policies with Ms. Law. (Pl.'s Ex. O, 5/24/07 letter.)

On June 6, 2007, Ms. Law wrote to State Farm asserting that it owes her a defense under her umbrella policy in the state court action in light of the recent denial of her motion for summary disposition. (Pl.'s Ex. P, 6/6/07 letter.) On June 11, 2007, Michigan Municipal's retained counsel also wrote to State Farm, asserting that State Farm had prematurely denied coverage. (Pl.'s Ex. Q, 6/11/07 letter.)

On June 15, 2007, State Farm wrote to Ms. Law, once again declining to provide coverage for her defense or indemnification in the state court action. Specifically, State Farm stated that the allegations in that state court action did not fall within her homeowner's policy's definitions of "bodily injury," "property damage," or "occurrence." (Pl.'s Ex. R, 6/14/07 letter.)

In July 2007, the state court action proceeded to case evaluation without State Farm's participation and was subsequently settled for $200,000. Michigan Municipal demanded but State Farm declined to participate in the settlement negotiations or to contribute to the settlement.

On July 31, 2007, Ms. Law agreed, as a condition of the settlement, to assign Michigan Municipal any and all claims, rights, or causes of action against State Farm and State Farm's retained counsel. (Pl.'s Ex. U, 7/31/07 Assignment.)

On October 31, 2007, Michigan Municipal, as assignee for Ms. Law, filed this insurance coverage action against her insurer, State Farm, in Oakland County Circuit Court seeking damages from State Farm for the cost of defending Ms. Law and for settlement funds it paid to Ms. Law. This matter was subsequently removed to this Court on grounds of diversity jurisdiction and is now before the Court on the parties' cross-motions for summary judgment.

## II. Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most

favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.   Analysis

The core dispute between State Farm and Michigan Municipal concerns State Farm's duty to defend Ms. Law in the underlying state court action. State Farm also argues that, under Michigan law, there is no cause of action for the alleged breach of an implied covenant of good faith and fair dealing and no cause of action for the failure to act in good faith in settling claims arguably covered by an insurance policy. This Court first addresses the duty to defend issue.

### A.  Duty to Defend

Under Michigan law, it is well-established that the insurance company's "duty to defend and [its] duty to provide coverage are not synonymous." *Illinois Employers Ins. of Wausau v. Dragovich*, 362 N.W.2d 767, 769 (Mich. Ct. App. 1984). "The duty to defend is broader than the duty to pay." *Pattison v. Employers Reinsurance Corp.*, 900 F.2d 986, 989 (6th Cir. 1990). It extends to allegations which are groundless, false, or fraudulent; it extends to allegations that even arguably come within the policy coverage. *Id.* at 989-90. *Accord Capitol Reproduction, Inc. v. Hartford Ins. Co.*, 800 F.2d 617, 620 (6th Cir. 1986). Michigan law further recognizes that when an insurer fails to fulfill its duty to defend, "it becomes liable for all foreseeable damages flowing from the breach," including amounts

paid in settlement. *Capitol Reproduction*, 800 F.2d at 624. An insurer's duty to defend is determined by examining the allegations of the underlying complaint against the insured. *Detroit Edison Co. v. Michigan Mut. Ins. Co.*, 301 N.W.2d 832, 835 (Mich. Ct. App. 1980). The duty, however, is not limited by the precise language of the complaint; the insurer is required to look behind the allegations "to analyze whether coverage is possible. In a case of doubt . . . , the doubt must be resolved in the insured's favor." *Capitol Reproduction*, 800 F.2d at 620 (quoting *Western Cas. & Sur. Group v. Coloma Twp.*, 364 N.W.2d 367, 369 (Mich. Ct. App. 1985)). "An insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy, if there are any theories of recovery that fall within the policy." *Detroit Edison*, 301 N.W.2d at 835 (emphasis added). "Once triggered, the duty to defend continues until that stage in the proceedings is reached where there is no longer any uncertainty as to the possibility of coverage." *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 44 F. Supp.2d 847, 853 (E.D. Mich. 1997) (citing *Am. Bumper & Mfr. Co. v. Hartford Fire Ins. Co.*, 550 N.W.2d 475, 483 (Mich. 1996)).

Applying the above principles here, this Court concludes that Defendant State Farm owed Ms. Law a duty to defend and prematurely withdrew its defense in the underlying state court action.

### 1. Coverage Under State Farm's Policies

State Farm argues that it owed no duty to defend because (1) the allegations in the underlying state law complaint are not covered under Ms. Law's homeowner's policy in light of its definitions of "bodily injury," "property damage," and "occurrence;" and (2) although there are allegations in the underlying complaint that are arguably fit within the definitions

of "bodily injury" or "personal injury" as defined in Endorsement FE-7786 of Ms. Law's umbrella policy, coverage is expressly excluded under the terms of that policy.

Because State Farm concedes that, but for certain exclusions, it owed Ms. Law a defense for an arguably covered "loss" under her umbrella policy, this Court focuses its attention on at policy. It does so because, under Michigan law, an insurer has a duty to defend on all theories of recovery, including those not covered under its policies, if the allegations in the underlying lawsuit reveal a theory of recovery that does fall within one of its policies. *See Detroit Edison*, 301 N.W.2d at 835.

State Farm concedes that Ms. Horton's complaint alleges "that Ms. Law made false statements" about her which caused her to suffer, among other things, damage to her good name and reputation in the community, and this "injury" could arguably be considered "personal injury" as defined in Endorsement FE-7786 to her umbrella policy. (Def.'s Mot. at 12.)

Endorsement FE-7786 to Ms. Law's umbrella policy adds certain definitions and replaces those for "loss" and "personal injury." Because these replaced definitions are relevant to the parties' cross motions, they are set out here.

6. **"loss"** means:

* * *

   b. the commission of an offense, or series of similar or related offenses, which result in **personal injury** during the policy period.

* * *

9. "**personal injury**" means injury caused by one or more of the following offenses:

   a. false arrest, false imprisonment, wrongful eviction, wrongful detention, malicious prosecution;

16

b. libel, slander, defamation of character or invasion of rights of privacy.

(Pl.'s Ex. C, Umbrella Policy, Policy Endorsement FE-7786.)

This Court agrees with State Farm that the allegations in the underlying complaint describe conduct that fits within Endorsement FE-7786's definition of "personal injury;" i.e., the offenses of libel/slander/defamation of character. Michigan's Model Civil Jury Instructions define the intentional tort of "slander" as statement [of fact] which is false in some material respect and is communicated to a third person by [words/gestures] and has a tendency to harm a person's reputation." M. Civ. JI 118.02. To succeed on a libel/slander intentional tort claim under Michigan law, a plaintiff must prove that (1) the defendant made the statement of fact complained of to a third person by either printing, writing, signs, pictures, words or gestures; (2) the statement was about the plaintiff; (3) "the statement was false in some material respect, and the statement had a tendency to harm the plaintiff's reputation;" and (4) "as a result of the statement, the plaintiff suffered some damage." M. Civ. JI 118.05.

"The elements of a defamation claim are: (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication." *Mitan v. Campbell*, 706 N.W.2d 420, 421 (Mich. 2005). With regard to element (2), "[a] qualified privilege extends to all communications made bona fide upon any subject matter in which the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty and embraces cases where the duty is not a legal one but is of a moral and social character of

imperfect obligation." *Frohriep v. Flanagan (On Remand)*, ___ N.W.2d ___, ___, No. 273426, 2008 WL 1884097, at *7 (Mich. Ct. App. April 29, 2008) (internal quotes and citation omitted).  To overcome the defendant's assertion of a qualified privilege, a plaintiff must show "that the alleged libelous publication was made with actual malice, i.e., with knowledge of its falsity or reckless disregard of the truth." *Id.* at *7-8.

The allegations in Ms. Horton's underlying complaint describe conduct by State Farm's insured, Ms. Law, that fits Michigan's definitions of libel, slander, and defamation of character.  It was alleged that Ms. Law published false statements to third parties with reckless disregard as to whether they were false, and this conduct caused Ms. Horton's reputation to be damaged and led to her ultimate termination.  That the underlying complaint only identifies a single case of action – intentional interference with a business relationship or expectancy – does not foreclose a duty to defend.  It cannot be disputed that defamation is the offense that underlies the stated cause of action.  As the Michigan Supreme Court observed, "[t]he duty to defend cannot be limited by the precise language of the pleadings.  The insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible.  In a case of doubt as to whether or not the complaint against the insured alleges a liability of the insurer under the policy, the doubt must be resolved in the insured's favor." *Am. Bumper*, 550 N.W.2d at 481 (internal citations omitted).  This principle was recently restated by the Michigan Court of Appeals in a way that nicely fits this case.  "The duty to defend cannot be limited by the *imprecise* language of the pleadings.  The insurer still has a duty to look at the substance of the claims, which, in this case, appear to be some sort of libel or slander. . . .  Accordingly, the umbrella policy does appear to provide coverage." *Frankenmuth Mut. Ins. Co. v. Schmidt*,

No. 215698, 2000 WL 33416898, at *5 (Mich. Ct. App. July 21, 2000) (internal citation omitted). *Accord, Alticor, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 2:03-CV-350, 2006 WL 374174, at *3 (W.D. Mich. Feb. 17, 2006) (observing that "[i]t is the substance of the alleged injury, not the nomenclature, which determines the duty to defend."). The same is true here. State Farm's umbrella policy appears to provide coverage.

The next question then is whether, as State Farm argues, express exclusions for "personal injuries" apply.

### 2. Exclusions Under Umbrella Policy

Endorsement FE-7786 also replaced certain exclusions and added another. Two are at issue here: the "business pursuits" exclusion and the "specific intent" exclusion. The relevant provisions are set forth below along with a discussion whether they apply and thus excuse State Farm from its contractual duty to defend.

State Farm argues that it owed no duty to defend or indemnify Ms. Law in the underlying state court action because the umbrella policy expressly excludes (1) coverage for any loss caused by Ms. Law's business pursuits, and (2) coverage for "personal injuries" in light of allegations that Ms. Law acted with "specific intent to cause harm or injury" to Ms. Horton. Considering the facts of this case and the policy language, this Court disagrees with State Farm.

The Court begins its analysis with the following contract interpretation principles in mind. It is the insurer's responsibility to clearly express limits on coverage. *Auto Club Ins. Ass'n v. DeLaGarza*, 444 N.W.2d 803, 806 (Mich. 1989). Thus, insurance exclusion

clauses are construed strictly and narrowly. *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 435 (Mich. 1992).

### a. Business Pursuits Exclusion

Endorsement FE-7786 replaced the "business pursuits" exclusion in Ms. Law's umbrella policy with the following:

6. for any loss caused by your **business** pursuits or arising out of **business property**:

    a. unless:

        (1)    the underlying insurance listed on the **Declarations** provides coverage for the **loss**; and

        (2)    the **loss** does not involve an **automobile, recreational motor vehicle**, or watercraft.

    b. however; this exclusion does not apply to a **private automobile** or watercraft when used for **business** if:

        (1)    the underlying insurance listed on the **Declarations** applies to the **loss**; and

        (2)    the **private automobile** or watercraft is not for hire either for the use of others or for carrying the property of others.

* * *

(Umbrella Policy Endorsement FE-7786.)

Despite State Farm's arguments to the contrary, there are no allegations in the underlying complaint that, when Ms. Law spread false and negative rumors about Ms. Horton to 48th District Court Judge D'Agostini at an evening political fundraiser and to the 48th District Court Administrator, she was pursuing her business as an elected official with the Township of West Bloomfield. In fact, while State Farm was still providing Ms. Law with a defense in the underlying action, Ms. Law's motion for summary disposition was

denied in part because the Court found that material questions of fact still existed for trial on the issue whether Ms. Law was acting within the scope of her governmental authority when she engaged in the challenged conduct. (Pl.'s Ex. N, 5/23/07 Tr. at 20-23.) In denying that motion, the Court observed that "the 48th District Court and [Ms. Law] as township clerk for the Township of West Bloomfield are separate and distinct entities . . . . are two separate branches of government, judicial and executive." (*Id.* at 23.)

The critical issue is whether the "loss" for "personal injury" alleged in the underlying complaint was "caused by" Ms. Law's "business pursuits." Under Michigan law, an insurer like State Farm is required to look behind the allegations in the underlying complaint "to analyze whether coverage is possible;" and if there is any doubt, "the doubt must be resolved in the insured's favor." *Capital Reproduction*, 800 F.2d at 620. State Farm did not do that here. Although it did initially defend Ms. Law in the underlying suit, it withdrew its defense before it reached a stage in the proceedings "where there [was] no longer any uncertainty as to the possibility of coverage." *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 44 F. Supp.2d at 853. Accordingly, unless the "specific intent" exclusion in its umbrella policy applies, State Farm breached its contractual duty to defend when it prematurely withdrew its defense in May 2007.

The Court now examines whether the "specific intent" exclusion for "personal injury" applies.

### b. Specific Intent to Cause Harm or Injury Exclusion

Endorsement FE-7786 added the following exclusion to Ms. Law's umbrella policy:

16.    for **personal injury** when you act with specific intent to cause harm or injury.

(*Id.*)

State Farm argues that, because it is alleged in the underlying amended complaint that Ms. Law had "a desire to harm" the underlying plaintiff, there is no coverage for any arguably covered loss under Ms. Law's umbrella policy. (Def.'s Mot. at 13.) State Farm is mistaken for several reasons.

First, this argument fails to acknowledge that "specific intent" is not required for the slander/libel/defamation offenses that trigger coverage under Ms. Law's umbrella policy.

Second, State Farm's argument fails to consider and compare the relevant allegations in the underlying plaintiff's original and amended complaints concerning the alleged "desire to harm." The First Amended Complaint alleges that:

> 21. According to testimony given by 48th District Court Judge Diane D'Agostini in a related case, Defendant Law brought the Lori Barron ROA Document to Judge D'Agostini's attention and identified Plaintiff as the person who had either written the attached notes and/or been circulating the ROA Document around the Township.
>
> 22. Plaintiff did not write the notes or circulate the aforementioned ROA Document to anyone, nor did she contact the media about Lori Barron's arrest.
>
> 23. Nevertheless, based on the mis-information provided by Defendant Law, as well as <u>a desire to do harm</u> to the individual [Ms. Law] believed was involved in dissemination of the aforesaid ROA Document, Plaintiff became the target of an "investigation" which was launched by [the] 48th District Court into the matter.
>
> 24. Defendant Law further assisted the so-called "investigation" by spreading other false and negative rumors about Plaintiff to court officials, which could provide a pretext for terminating Plaintiff.

(Def.'s Ex. A, 1st Am. Compl. at ¶¶ 21-24 (emphasis added).)

In the original complaint filed in the underlying action, however, the plaintiff alleged that it was Marc Barron who had a desire to harm her; not Ms. Law. In the original

complaint Marc Barron was a named defendant. The amended complaint was filed after he was dismissed from the underlying lawsuit. Specifically, the original complaint alleged that:

24. According to testimony given by 48th District Court Judge Diane D'Agostini in a related case, Defendant Law was the person who brought the Lori Barron ROA document to D'Agostini's attention and identified Plaintiff as the person who had either written the attached notes and/or been circulating the document around the Township.

25. Plaintiff [Ms. Horton] did not write the notes or circulate the aforementioned ROA document to anyone, nor did she contact the media about Lori Barron's arrest.

26. Nevertheless, based on the misinformation provided by Defendant Law, as well as Defendant Barron's desire to do harm to the individual he believed was involved in dissemination of the aforesaid ROA document, Plaintiff became the target of an "investigation" which was launched by [the] 48th District Court into the matter.

27. Defendant Law further assisted the so-called "investigation" by spreading other false and negative rumors about Plaintiff to court officials, and later police, which could provide a pretext for terminating her.

(Pl.'s Mot., Ex. A, Original Compl. at ¶¶ 24-27 (emphasis added).) It is not apparent from the allegations in the First Amended Complaint exactly who had a desire to harm the underlying plaintiff. Under Michigan law, the insurer is required to look behind the allegations so as to analyze whether coverage is possible and to resolve all doubt in the insured's favor. *Capitol Reproduction,* 800 F.2d at 620. State Farm did not do that here.

Moreover, while State Farm was providing a defense and investigating whether it had a duty to defend Ms. Law, her deposition was taken in the state action. In that deposition, Ms. Law denied that she intended to harm Ms. Horton: "I had no reason to get [Ms. Horton] in trouble or to say anything maliciously against her, since I did not know her. My concern was regarding the Court." (Law 4/30/06 Dep. at 57.) At her deposition, Ms. Horton was

asked what she thought motivated Ms. Law to pass along this false information about her. She testified that she believed that Ms. Law's conduct was motivated by her friendship with Marc Barron and that this would help her to look good in his eyes. She did not testify that Ms. Law acted with the specific intent to have her fired or to otherwise harm or injure her. (Horton 4/26/07 Dep. at 27-31.)

Finally, in her response to Ms. Law's motion for summary disposition in the underlying state action, Ms. Horton argued that Sharon Law "fed false information" to Ms. Horton's employer, the 48th District Court, "in order to assist the political career of a family friend, Marc Barron." (Pl.'s Ex. M, Horton State Action Resp. at 10, 12, 17, 18, 20.) State Farm withdrew its defense of Ms. Law after all of this information was provided. Accordingly, it breached its duty to defend when it did so. Analysis of the available information in the underlying state court action showed that coverage was possible. Neither party in the underlying state action was arguing that Ms. Law acted with specific intent to cause Ms. Horton's personal injuries. Any doubt as to coverage "must be resolved in the insured's favor." *Capitol Reproduction*, 800 F.2d at 620 (internal quotes and citation omitted). Moreover, "[a]n insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy, if there are any theories of recovery that fall within the policy." *Detroit Edison*, 301 N.W.2d at 835 (emphasis added).

### B. Breach of Implied Covenant of Good Faith and Fair Dealing

In addition to its argument that it owed no duty to defend or indemnify, State Farm's motion for summary judgment also argues that, under Michigan law, there is no cause of action for the alleged breach of an implied covenant of good faith and fair dealing and no

cause of action for the failure to act in good faith in settling claims arguably covered by an insurance policy. State Farm's arguments are rejected.

State Farm's first argument ignores that Michigan Municipal's complaint asserts a contract claim; not a tort. Michigan law does recognize an implied contractual duty on the part of the insurer to act in good faith when investigating an insurance claim and when negotiating a settlement so that it falls within policy limits. *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 883 F. Supp. 1101, 1111 (E.D. Mich. 1995) (citing Michigan cases). By refusing a demand to take part in settlement negotiations when it was obligated to do so under its contractual duty to defend, State Farm breached its duty to defend and this covenant. Because State Farm breached its duty to defend, it is liable for all foreseeable damages flowing from that breach, including the amount Michigan Municipal paid to settle the underlying lawsuit. *Capitol Reproduction*, 800 F.2d at 624.

## IV.  Conclusion

For the foregoing reasons, Defendant State Farm's motion for summary judgment is DENIED. Plaintiff Michigan Municipal's cross motion is GRANTED as to Defendant State Farm's liability for the breach of its contractual duty to defend and the breach of its policy's implied covenant of good faith and fair dealing for the premature withdrawal of its defense and its refusal to participate in settlement negotiations. Plaintiff's motion is DENIED without prejudice as to the amount of damages owed by Defendant as a result of its breach.


                    s/Nancy G. Edmunds_____
                    Nancy G. Edmunds
                    United States District Judge

Dated:  June 5, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 5, 2008, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager